### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

**B.B., a minor, et al.,**

    *Plaintiffs*,

**v.**                                         **Case No. SA-18-CV-1332-JKP**

**JAMES HANCOCK, et al.,**

    *Defendants*.

### REDACTED MEMORANDUM OPINION AND ORDER

Before the Court is a motion for summary judgment filed by Bexar County Sheriff's Office Deputies James Hancock, Jacob Rodriguez, Brian Wolfe, Bryan Smith, Alexander Uriegas, Eric Richards, Gus Trevino, and Carl Davis (Defendants) (ECF No. 129). With the filing of the response (ECF No. 133) and reply (ECF No. 138) the motion is ripe for ruling. For the reasons set forth below, the Court grants in part and denies in part the motion.

### I. BACKGROUND

On November 14, 2018, a cadre of law enforcement personnel conducted a raid at 5330 Brisa Estates. They had the wrong house. Mrs. Lucil Basco and her young child were home. Mrs. Basco was handcuffed and she and her child were taken out of their home while law enforcement conducted a sweep and a search. When the raid was concluded, Mrs. Basco was led back into her home—still in handcuffs—where she received an apology and a phone number.

The Basco family brings claims under 42 U.S.C. § 1983 for unlawful entry into and search of their home, seizure of property, and excessive force in violation of the Fourth Amendment against law enforcement Defendants Hancock, Rodriguez, Wolfe, Smith, Uriegas, Richards, Trevino, and Davis. These Defendants assert qualified immunity.

## II. SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material" and facts are "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over material facts qualify as "genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Given the required existence of a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When seeking summary judgment on an affirmative defense, the movant "must establish beyond peradventure" each essential element of the defense. *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011), *adhered to on reh'g en banc*, 698 F.3d 229 (5th Cir. 2012); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986).

Once the movant has carried its summary judgment burden, the burden shifts to the non-movant to establish a genuine dispute of material fact. When considering a motion for summary judgment, courts view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224,

234 (5th Cir. 2016) (citation omitted). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234 (citation omitted). Additionally, the courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

### III. QUALIFIED IMMUNITY

Qualified immunity shields government officials from § 1983 liability *unless* the defendant's actions "violated a federal statutory or constitutional right" *and* the right was "clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Both prongs must be satisfied to deny qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may begin the analysis at either prong. *Id.* at 236.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle*, 566 U.S. at 664). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Thus, the "Supreme Court has rejected a rigid requirement that previous cases be 'materially similar' in order for the law to be clearly established. We need not immunize an officer from suit for an obvious violation simply because no case has held that the officer's precise conduct was unlawful." *Gerhart v. McLendon*, 714 F. App'x 327, 334-35 (5th Cir. 2017) (per curiam) (citations omitted). Accordingly, a nonmovant satisfies the clearly established prong

by demonstrating that "the state of the law at the time of the incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation and internal quotation marks omitted).

## IV. DISCUSSION

### A. Objection to Evidence

While Defendants do not present a formal objection, for the same reasons asserted in their previous motion for sanctions (ECF No. 103), they "reassert that the testimony of the CI should be excluded as a sanction for the Plaintiffs' discovery conduct." *ECF No. 129 at 16*. The Honorable Richard B. Farrer ruled on that motion (ECF No. 128) and Defendants did not appeal that order to the District Judge. Accordingly, Defendants' objection to the CI's deposition testimony is overruled.

### B. Clearly Established Law

Viewing the central facts and the summary judgment evidence "in the light most favorable" to the nonmovants, *Tolan*, 572 U.S. at 655-57, Plaintiffs sufficiently allege the following violations of the Fourth Amendment: (1) warrantless entry into their home based on a defective warrant, (2) search of their home upon a defective warrant and after the deputy Defendants realized they were at the wrong house, (3) seizure based on the destruction of Plaintiffs' property, and (4) excessive force based upon the handcuffing of Mrs. Basco and the separation of her child from her.

It is clearly established that an affidavit for a warrant must include truthful statements that establish probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). It is also clearly established that law enforcement entering a dwelling must knock on the door, announce their presence, and state their authority before entering, unless they "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous

or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

The law of the Fifth Circuit "clearly establishes that searches of the wrong residence are presumptive constitutional violations." *Hunt v. Tomplait*, 301 F. App'x 355, 361 (5th Cir. 2008) (per curiam). And when law enforcement officers are executing a search warrant, they are required to immediately discontinue the search upon realizing they are in the wrong residence. *Maryland v. Garrison*, 480 U.S. 79, 80 (1987); *Simmons v. City of Paris*, 378 F.3d 476, 479-80 (5th Cir. 2004).

Finally, while law enforcement executing a search warrant founded on probable cause may detain the occupants of the premises in handcuffs while the search is conducted, such detention must be objectively reasonable. *Michigan v. Summers*, 452 U.S. 692, 705 (1981); *Muehler v. Mena*, 544 U.S. 93, 95 (2005); *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham* v. *Connor*, 490 U.S. 386, 397 (1989)). The use of handcuffs "for a prolonged and unnecessary period of time" is not reasonable. *Rettele*, 550 U.S. at 614 (citations omitted).

## C. Summary Judgment Analysis

Whether conduct violates the Fourth Amendment turns on reasonableness. *Camara* v. *Municipal Court of City and County of San Francisco*, 387 U.S. 523 (1967)[1]; *Terry v. Ohio*, 392 U.S. 1 (1968)[2]; *Bell v. Wolfish*, 441 U.S. 520 (1979)[3]; *Whren v. United States*, 517 U.S. 806

---

[1] "In cases in which the Fourth Amendment requires that a warrant to search be obtained, 'probable cause' is the standard by which a particular decision to search is tested against the constitutional mandate of reasonableness." *Camara*, 387 U.S. at 534.

[2] "The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Terry*, 392 U.S. at 21.

[3] "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Wolfish*, 441 U.S. at 559.

(1996)[4]; *Caniglia v. Strom*, 141 S. Ct. 1596, 1602 (2021) (J. Alito, concurring) (characterizing "reasonableness" as "the basic Fourth Amendment question"). Thus, to overcome Defendants' qualified immunity assertion, Plaintiffs must establish that genuine issues of material fact exist regarding the reasonableness of the Defendants' conduct. *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008) (citing *Michalik v. Hermann,* 422 F.3d 252, 262 (5th Cir. 2005)). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

**1. Search Warrant**

Plaintiffs contend that the affidavit presented to obtain the warrant in this case included unsubstantiated and unreliable information. *ECF No. 1 at 11.* When a plaintiff demonstrates it is more likely than not that a warrant affidavit included a false statement that was made "knowingly and intentionally, or with reckless disregard for the truth," *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) or that included "misleading material omissions that were recklessly, intentionally, or knowingly omitted from the affidavit," *Marks v. Hudson*, 933 F.3d 481, 487 (5th Cir. 2019) (citing *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006)), the Court must examine the affidavit with "the false material set to one side," the omitted facts inserted, and determine whether "the reconstructed affidavit establishes probable cause. If "the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

---

[4] Every Fourth Amendment case "turns upon a 'reasonableness' determination." *Whren*, 517 U.S. at 817.

*Franks*, 438 U.S. at 156. In other words, an ill-gotten warrant taints every act that stems from that warrant.[5]

In making his application for the search warrant at issue in this case, Deputy Rodriguez swore that through "personal investigation and/or through discussions with other law enforcement personnel," within the past seventy-two hours, he had "received information from a credible and reliable person" about methamphetamine "being possessed at the above location" and that the informant had "demonstrated his/her ability to identify methamphetamine and the paraphernalia related to its ingestion, packaging and sale." *ECF No. 129-8 at 2-3* (hereinafter Affidavit). Rodriguez requested a warrant to search the referenced location "based on the information provided by the informant and verified through investigation." *Id.* Plaintiffs argue that a reasonable jury could conclude that each of these statements was made with reckless disregard for the truth. *ECF No. 133 at 10-16.*

### a. The location of the alleged stash house

In his affidavit requesting a search warrant, Rodriguez states that "he has good reason to believe, and does believe," that methamphetamine was being stored at "a single story home, beige stone in color with white trim located at 5330 Brisa Estates." (hereinafter 5330) Affidavit. He further attests that he received this information from a "credible and reliable person" and that the information was "verified through investigation." *Id.* Rodriguez also states that he is "thoroughly familiar with the information contained in this affidavit, through personal investigation and/or through discussions with other law enforcement personnel." *Id.* Rodriguez's investigative report states that the location of the stash house came from Deputy Smith. *ECF No. 129-7 at 4* (Report). The investigative report and Smith's deposition testimony reflect that before Rodriguez drafted

---

[5] And "when an intermediary's proceeding is tainted by an officer's unconstitutional conduct, the independent-intermediary doctrine does not apply." *Winfrey v. Rogers*, 901 F.3d 483, 496 n.4 (5th Cir. 2018).

the affidavit, the CI directed Smith through a neighborhood ("[CI] knew exactly where [CI] was going"), pointed out the alleged stash house at 5330, described the interior of the house, and sketched its floor plan. *Id.*; Smith Dep. at 35-39, 107-08.

In deposition testimony, the CI disagrees that they made an unequivocal identification of 5330 as the stash house. The CI testifies that the house was chosen as the location by process of elimination, in part because a man the CI did not recognize came out of another house being considered as the location. CI Dep. at 16-37, 116-117. Additionally, the CI's account of the ride to identify the house conflicts with Smith's account.

**b. The informant's ability to identify methamphetamine**

The affidavit for search warrant states that the CI had demonstrated the ability to identify methamphetamine and the paraphernalia related to its ingestion, packaging, and sale. Affidavit. Rodriguez testified the basis for this statement was that the CI knew the street names of meth and the CI's report of a location that distributed methamphetamine was confirmed with the San Antonio Police Department. Rodriguez Dep. at 33, 37. ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

**c. The informant as a credible and reliable source**

The affidavit for search warrant states the CI is a credible and reliable source because "the informant has given information in the past which has proven to be true and correct as well as credible." Affidavit. It also states that Rodriguez "advised the informant that false statements would lead to criminal charges being filed against him/her for giving false information to a peace officer. The informant understood the legal implications and maintains that the information he/she provided [ ] is correct." *Id.* Rodriguez testified in deposition that the CI was credible and reliable

because the CI previously conducted a successful "buy walk." Rodriguez Dep. at 20. Additionally, the CI gave Smith detailed information about a suspected drug trafficker that was confirmed. *Id. at 21-22.*

**d. The information in the affidavit verified through investigation**

The affidavit for search warrant states that Rodriguez verified through "personal investigation" the identity and criminal history of the individual the CI said was guarding the house and that the electricity at 5330 was in Raymond Basco's name. Affidavit. Rodriguez testified in deposition that he and Deputy Smith did research on the on the house and on the individual the CI said was "watching the product" (the guard). Rodriguez Dep. at 11, 26, 68. Rodriguez testified that the research found the name of the homeowner and a photo of the guard and, when asked, the CI denied knowing the homeowner and confirmed that the photo was the guard he knew to be occupying the stash house. The research found no connection between the homeowner and the guard. *Id.* at 12-13. Finally, Rodriguez could not confirm the guard's presence at 5330 and did not find any criminal history connected to the guard. *Id.* at 13.

Smith testified that the raid was "based off the information by the confidential source. That was it." Smith Dep. at 56. The affidavit shows and the deposition testimony confirms the search warrant was sworn out on the word of the CI. Beyond the CI's say-so the deputies did scant investigation to confirm the assertion that 5330 was a stash house that stored ████████ ██ methamphetamine and ████████████████ cash.

The deputies testify that the CI was certain that 5330 was the stash house. The CI testifies that he was not certain 5330 was the stash house and that he expressed this uncertainty to law enforcement at the time of the identification. Deciding whose testimony is the truth requires testing the credibility of the witnesses, which is a matter for the factfinder at trial.

**e. Supervisory review of the affidavit**

Sergeant Hancock reviewed the warrant affidavit. *ECF No. 129 at 8*; Hancock Dep. 7:15-18; 8:3-4. A supervisor who affirmatively participates in an incident may be held liable under 42 U.S.C. § 1983. *Wernecke v. Garcia*, 591 F.3d 386, 401 (5th Cir. 2009); *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). Plaintiffs allege that Hancock "knew as much as Smith and thus knew there was insufficient information to identify Plaintiffs' home as the alleged stash house." *ECF No. 133 at 17-18*. Hancock testifies that he reviewed the affidavit for search warrant, that everything in the affidavit was true, and that he drove by the house and provided a description of the house for the search warrant. Hancock Dep. 8:3-8; 70:1-72:14.

Defendants do not put forward any contrary arguments or point to other evidence with respect to Hancock's participation in obtaining the search warrant. They do not contest what Plaintiffs allege Hancock knew when he reviewed the affidavit for search warrant. Rather, they rest on the reliability of the CI and the veracity of the information he provided. As noted above, decisions on disputed issues of material fact, such as those that exist in this claim, are reserved for the factfinder. As discussed further below, Smith's participation in the alleged Fourth Amendment violation makes him subject to liability.

**2. Knock and Announce**

It is a common law principle and Fourth Amendment command that law enforcement officers must "knock and announce" their presence and state their authority before entering a dwelling. *Wilson* v. *Ark.,* 514 U.S. 927, 929, 934-936 (1995). However, the rule is not inflexible. *Id.* at 934. Knock and announce is not required when "circumstances present a threat of physical violence, or if there is reason to believe that evidence would likely be destroyed if advance notice were given, or if knocking and announcing would be futile." *Richards* v. *Wisconsin,* 520 U.S. 385,

394 (1997) (cleaned up, citations and internal quotations omitted). The burden to show that circumstances exist to ignore the general rule, "is not high." *Id.*

Mrs. Basco testified that she was lying on the couch when she heard a loud bang immediately followed by law enforcement entry into her home. L. Basco Dep. at 78-79. It is unclear whether law enforcement knocked prior to entering the home. But a reasonable inference can be made that even if they knocked, they did not give Mrs. Basco any opportunity to answer the door.

Deputies Trevino and Uriegas and Sergeant Hancock testified that the typical knock and announce consists of knocking, shouting, "Police, search warrant," and breaching the door. In "every search warrant we do" . . . "we knock on the door and 'Sheriff's Office, search warrant,' give it a few moments and then, we're in." Uriegas Dep. 61:15-20.

> Q. . . . explain to me if you know, like, the instant you announce yourself, whether as police, sheriff, how quickly after that is the door being opened? Is it instant? Is there some kind of delay? Do you know?
> A. Two, three-second delay. I don't know.
> Q. Okay. So you're getting up there. You're saying, "Police" --
> A. Getting ready, set, "Police, search warrant," boom.

Trevino Dep. 32:9-18.

> Q. Can you demonstrate for us?
> A. Well, you knock and announce, "Sheriff, search warrant."
> Q. And then what? Wait? Or immediately break the door?
> A. You break the door.
> Q. Immediately?
> A. Pretty much.
> Q. You don't give the person an opportunity to open the door?
> A. Not necessarily, no.
> Q. What's the point of knocking and announcing yourself?
> A. So that we don't get shot when we cross the threshold. So that they know we're law enforcement instead of somebody trying to rob them.
> Q. Got you. And so you knock, you say law enforcement, and then you break the door open without waiting to see if they're going to come open the door for you?
> A. Correct.

11

Hancock Dep. 44:4-25.

How long law enforcement must wait between announce and "boom" is context specific. Courts must examine the totality of the circumstances. *United States* v. *Banks,* 540 U.S. 31, 36-42 (2003). A "reasonable wait time" in one case may be the fifteen to twenty seconds it would take to flush cocaine, *id.* at 41, or no time at all where "officers had a reasonable belief that an announcement would endanger the officers and the occupants and that evidence could be destroyed," *United States v. Lineberry*, 93 F. App'x 632, 634-35 (5th Cir. 2004) (judgment vacated and case remanded on other grounds). What is clear is that absent exigency or futility, officers must extend the courtesy of a knock and announce that gives an individual the opportunity to answer and that no-knock entries should not be used "as the *default* mode of executing drug-related search warrants." *Bishop v. Arcuri*, 674 F.3d 456, 464 (5th Cir. 2012) (emphasis in original). In other words, "Police, search warrant, boom" as a matter of routine runs counter to the commands of the Fourth Amendment.

It is undisputed that law enforcement believed ███████████████████ ██ methamphetamine and ███████████████ cash would be found in the house. Smith Dep. 68:6-15; Rodriguez Dep. 22:19-23:1. Officers conducted a traffic stop of Mrs. Basco shortly before the raid during which they searched her vehicle and learned that she is a nurse. And officers were surveilling the home both when Mrs. Basco left to collect her child and when she returned with him. Smith Dep. 40:24-41:2, 41:10-18, 45:2-8, 50:20-51:3, 53:2-4. The evidence also shows that the officers did not believe there were dogs in the home and that they only assumed there would be weapons. Rodriguez Dep. 62:22-63:1 (testifying the CI said, "no dogs, possibly weapons"); Trevino Dep. 42:18-23 (stating, "If there's drugs, there's weapons.").

Upon the summary judgement record, the Court cannot conclude as a matter of law that the entry into the Basco's home was reasonable. Fact issues abound as to whether it was reasonable for law enforcement to believe that knocking and announcing their presence was dangerous, would be futile, or would inhibit effective investigation of the suspected crime. Thus, whether the method employed to enter Plaintiffs' home was reasonable is a question for a jury that precludes summary judgment.

### 3. Search of Home and Seizure of Property

The Supreme Court has "held that police officers do not necessarily violate the Fourth Amendment when they mistakenly execute a search warrant on the wrong address." *Simmons v. City of Paris, Tex.*, 378 F.3d 476, 479 (5th Cir. 2004) (citing *Maryland v. Garrison*, 480 U.S. 79, 80 (1987)). However, search of the premises must stop immediately upon realizing they have entered the wrong address. *Id.* at 479-80.

Here, it is undisputed that law enforcement had the wrong address. *ECF No. 129 at 22*; Smith Dep. 80:24-81:3; Hancock Dep. 50:22-51:4. Defendants contend that no search was conducted, ██████████████████████████████████████████████ ████████████████. The video evidence also shows that law enforcement remained in the home after the sweep was concluded. IMG 194. And several officers escorted Mrs. Basco back into her home and remained inside where Hancock, Rodriguez, and Smith apologized and explained "what was going on," asked her some questions, including if she knew the guard, and gave her a phone number purportedly to report the damages to her home. *Id.*; Hancock Dep. 50:8; Rodriguez Dep. 63:21-64:7, 79:2-17, 82:19-21; Smith Dep. 79:1-10; 88:25-89:14; 90:10-91:12. Additionally, the video evidence shows that Mrs. Basco was still handcuffed when law enforcement led her back into her home. IMG 203. That the Basco's home was damaged during the raid is undisputed. And

no one disputes that remuneration is due for the property damage. Smith Dep. 109:12-110:6; Rodriguez Dep. 83:21-85:14. Accordingly, the Court concludes that the record precludes summary judgment on these claims.

### 4. Excessive Force

"In the Fifth Circuit, to succeed on an excessive force claim, the plaintiff bears the burden of showing: (1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (citation and internal quotation marks omitted). "[P]sychological injuries may sustain a Fourth Amendment claim." *Flores v. City of Palacios*, 381 F.3d 391, 398 (5th Cir. 2004) (citing *Dunn v. Denk*, 79 F.3d 401, 402 (5th Cir. 1996) (*en banc*)). However, the injury associated with an excessive force claim "must be more than a *de minimis* injury and must be evaluated in the context in which the force was deployed." *Lincoln v. Turner*, 874 F.3d 833, 846 (5th Cir. 2017) (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001)). "The second and third elements collapse into a single objective-reasonableness inquiry determined by the crime's severity, the suspect's threat, and whether the suspect is actively resisting arrest or trying to flee." *Hutcheson v. Dall. Cty.*, 994 F.3d 477, 480 (5th Cir. 2021) (internal quotations omitted) (quoting *Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018)).

Defendants argue that Plaintiffs' claim of excessive force fails because the undisputed evidence shows that none of the Defendants handcuffed Mrs. Basco, the amount of time she was handcuffed was objectively reasonable, and neither Mrs. Basco nor her child suffered more than a *de minimis* injury. *ECF No. 129 at 12-13*.

Courts must examine an injury in context with the application of force when deciding whether

an injury "exceeds the *de minimis* threshold." *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (quoting *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013). As the Fifth Circuit explains:

> although a *de minimis* injury is not cognizable, the extent of injury necessary to satisfy the injury requirement is directly related to the amount of force that is constitutionally permissible under the circumstances. *Any* force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold, and, conversely, objectively reasonable force will result in *de minimis* injuries only. Consequently, only one inquiry is required to determine whether an officer used excessive force in violation of the Fourth Amendment. In short, as long as a plaintiff has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force.

*Id.* at 309 (5th Cir. 2017) (quoting *Brown*, 524 F. App'x at 79 (quoting *Ikerd v. Blair*, 101 F.3d 430, 434-35 (5th Cir. 1996))) (emphasis in original); *accord Durant v. Brooks*, 826 F. App'x 331, 336 (5th Cir. 2020) (per curiam).

The video evidence shows Mrs. Basco being escorted out of her home by a sheriff's deputy. A DEA agent handcuffs her hands behind her back. The sheriff's deputy is carrying Mrs. Basco's child. The deputy hands the child off to an individual outside the line of sight of the camera. Mrs. Basco and her child are then led away by the deputy, beyond the camera's view. IMG 189 at 00:14-00:28. It appears Mrs. Basco is later led across the camera's view and still later, she and her child are led back inside the house, this time her hands are cuffed in front of her. IMG 192 at 00:26-00:29; 203 at 00:00-00:04. The video evidence also records Mrs. Basco's and her child's distress. Law enforcement can be heard shouting over the child's cries; Mrs. Basco asking, "What's going on?"; and what could be a child's shriek at the end of the video. IMG 190 at 00:00-00:20.

Law enforcement executing a search warrant "founded on probable cause" have the "limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981). Such a detention may include being held in handcuffs during the

search. *Muehler v. Mena*, 544 U.S. 93, 95 (2005). The authority "is categorical," *id.* at 98, and is limited to persons in "the immediate vicinity of the premises to be searched." *Bailey v. United States*, 568 U.S. 186, 201 (2013).

*Summers* detentions can be justified by legitimate law enforcement interests, such as "preventing flight in the event that incriminating evidence is found" or "minimizing the risk of harm to the officers." *Summers*, 452 U.S. 692, 702. Even so, officers' efforts to secure a premises must be objectively reasonable. *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham* v. *Connor*, 490 U.S. 386, 397 (1989)). "Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time." *Id.* (citing *Muehler*, 544 U.S. at 100; *Graham*, 490 U.S. at 396-399).

Defendants argue that none of them applied handcuffs to Ms. Basco and therefore, qualified immunity applies to all of them. As noted above, Sergeant Hancock was the on-scene supervising officer. He testified that he knew they were at the wrong house "probably something less than a minute" after the breach. Hancock Dep. 51:4. He also testified that he took off his gear "immediately after clearing the house." *Id.* 83:8-10. And, that the handcuffs were removed "as soon as I got out there." *Id.* 51:22-52:1. Smith testifies that after he finished the sweep, "Ms. Basco was still in the residence because I walked back in . . . [we] made contact with her. We escorted her out, and handcuffs were in the front." Smith Dep. 77:2-20. Rodriguez testifies when Smith and Wolfe came out of the house and told him they had the wrong house, he immediately walked over to Mrs. Basco and uncuffed her. Rodriguez Dep. 63:2-66:8. ██████████████████

████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

Additionally, the video evidence shows Mrs. Basco being escorted back into her home with her hands still in handcuffs. IMG 203.

Even though Handcock, Smith, and Rodriguez knew they were at the wrong address and knew Mrs. Basco was handcuffed, none of them immediately removed the handcuffs. None of the testimony conclusively establishes how long Mrs. Basco was in handcuffs. Despite the video evidence showing Mrs. Basco being handcuffed, Smith, Rodriguez, and Hancock all testify they don't know who handcuffed her. Smith Dep. 75:8-10; Rodriguez Dep. 65:15; Hancock Dep. 51:20-21. And the Defendants' argument that the video evidence shows the handcuffs being removed is false. IMG 203.

Upon the summary judgment evidence presented, the Court cannot conclude as a matter of law that the time Mrs. Basco spent in handcuffs was objectively reasonable. Defendants contend that Mrs. Basco could not have been in handcuffs more than two minutes and ten seconds after the all-clear but this estimated time appears to be contradicted by the evidence including the video and deposition testimony. Moreover, a reasonable jury could evaluate the totality of the circumstances and find that two minutes and ten seconds was unreasonable. Accordingly, the Court concludes material factual disputes exist as to the extent of injuries to Mrs. Basco and her child during their detentions and whether the length of time Mrs. Basco was handcuffed was reasonable. The liability of the Defendants is discussed below.

**5. Liability**

In *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, the Fifth Circuit recognized that "police officers may act on the basis of information known by their colleagues in conducting

searches and seizures," 537 F.3d 404, 430-31 (5th Cir. 2008) (citing *United States v. Hensley,* 469 U.S. 221, 230-231 (1985); *Whiteley v. Warden,* 401 U.S. 560, 568 (1971)). And that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *Id.* (quoting *United States v. Robinson,* 536 F.2d 1298, 1299 (9th Cir. 1976)).

Later that year, the Fifth Circuit found persuasive the Ninth Circuit's reasoning in *Ramirez v. Butte-Silver Bow County,* 298 F.3d 1022, 1027 (9th Cir. 2002), *aff'd sub nom. Groh v. Ramirez,* 540 U.S. 551 (2004), *overruled on other grounds by United States v. Grubbs*, 547 U.S. 90 (2006), which found that "certain officers who 'plan and lead' a search are responsible for ensuring that they have lawful authority for their actions." *Hunt v. Tomplait,* 301 F. App'x 355, 360 (5th Cir. 2008) (per curiam). In *Hunt*, the Fifth Circuit noted that what is "reasonable for a particular officer depends on his role in the search." 301 F. App'x at 362 n.8; *accord Gerhart v. Barnes*, 724 F. App'x 316, 325 (5th Cir. 2018) (per curiam).

It is undisputed that Rodriguez was the case agent and Hancock was the supervisor at the scene. Rodriguez Dep. 66:1; Hancock Dep. 51:12-16. It is also undisputed that Smith possessed the same information about the residence that Rodriguez and Hancock did. After all, he provided the information for the search warrant. The summary judgment evidence shows that the deputy that breached the door and those in the stack had no reason to question the information provided by these leaders. Plaintiffs do not present evidence that those in the stack did not attend the briefing or that any of them disobeyed any order. Additionally, there is no evidence that Hancock directed the men in the stack to vacate the house upon his realizing that they were at the wrong house. Instead, he went outside to take off his gear. Hancock Dep. 83:8-10. Consequently, the law

enforcement officers in the stack did not violate the Basco's Fourth Amendment rights when they participated in the raid. Accordingly, dismissal of Plaintiffs' claims against those who acted only at the direction of the men who planned and led the raid is appropriate.

It would be ridiculous to expect a plaintiff whose home has been raided to be jotting down names and asking everyone what they did. That is why plaintiffs are allowed to name Doe defendants and who-did-what is sorted out in discovery. Here, Plaintiffs have been met with a wall of silence. Even though the testimony is inconsistent on many points, when asked who handcuffed Mrs. Basco ███████████████████████████████████████████████████████████████

███████████████████████████. [6]

---

[6] For example, "A. I did not search. I don't know. Q. Does anybody search? A. I did not. I don't know if anyone else did. . . . A. I don't know how long she was handcuffed. I didn't watch her, see, or take part in that." Wolfe Dep. 63:9-11; 82:13-14.

"Q. So were you part of the search team? A. We didn't search. . . . ███████████████████████████████████ A. I didn't see the [child] until she was carrying [the child] out . . . Q. are you aware that Ms. Basco was put in handcuffs? A. I'm not aware. Q. Okay. So you don't know who would have done it? A. No." Richards Dep. 51:6-7; 45:5-8; 47:23-24 48:7-11.

"Q. ████████████████████████████████████████████████████ . . . so is it your testimony, then, that you never saw Lucille Basco in handcuffs? A. I did not. No, sir." Uriegas Dep. 80:17-25; 94:17-19.

"A. No, I didn't search and that wasn't part of my role. Q. Okay. And then so, really, your job was to just breach and then get out? A. Breach, get out, make sure it's secure, I'm done. . . . Q. So was it your impression that [Mrs. Basco] was a suspect? A. No, they were just standing there around her. I mean, they weren't -- she wasn't in -- I mean, as far as I could see, I didn't even see handcuffs on her or nothing. She was just -- she was holding the baby." Trevino Dep. 50:20-25; 48:2-7.

"A. I don't know who handcuffed [Mrs. Basco] or what time they cuffed her . . . Q. Did you ask Smith or Wolfe when they came over to you and said it's the wrong house, did you ask them why is she still in handcuffs? A. No. Q. Why not? . . . A. She was with other officers at that time. So since I was the case agent, I was just going to walk up. It was maybe five seconds, maybe less than that, that he told me, hey. Well, I asked him what's wrong, because I saw him. He was coming out. He said wrong house. So then, he still had all his gear on. Everyone still had all their gear on. So I walked up and uncuffed her 'cause I don't believe that any of the other officers knew it was the wrong house." Rodriguez Dep. 65:15-66:8. *But see* IMG 203 (Mrs. Basco going back into her home, handcuffed).

Q. And your officers were the one who handcuffed her, right? A. I don't know. Q. You don't know which officer handcuffed her? A. I don't. Q. Okay, if it would have been one of your officers who handcuffed her, shouldn't you have said, "Hey, it's the wrong house, let her go"? A. And I believe that's what we did as soon as we got out there, as soon as I got out there." Hancock Dep. 51:17-52:1. *But see* IMG 203 (Mrs. Basco going back into her home, handcuffed).

The summary judgement evidence shows that Rodriguez, Smith, and Hancock planned and orchestrated the raid. Each of these men were present and knew they were at the wrong house, yet none of them directed the men in the stack to cease operations and exit the home, ███████ ████████████████████████████ none of them removed or directed the removal of Mrs. Basco's handcuffs upon realizing they were at the wrong house.

To establish liability under 42 U.S.C. 1983, a plaintiff must demonstrate the personal involvement of the defendant in the constitutional violation. "Personal involvement of supervising personnel generally includes giving a 'command, signal, or any other form of direction to the officers that prompted' the constitutional violation." *Turner v. Driver*, 848 F.3d 678, 696 (5th Cir. 2017). On the evidence presented, a reasonable jury could find that Rodriguez, Smith, and Hancock were each personally involved in the alleged Fourth Amendment violations because they participated in, facilitated, approved, condoned, or turned a blind eye to the conduct "for fear of what they might see." *Id.* at 696 n.88 (citations omitted).

The reasonableness of officer conduct is a fact-based inquiry that requires a careful balancing of the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotations omitted)). The Court recognizes that the actions of law enforcement are not to be judged with the benefit of 20/20 hindsight. *Id.* at 396-97. And that a court cannot determine whether an officer's conduct was reasonable "without settling on a coherent view of what happened in the first place." *Lampkin v.*

---

Q. ████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████ Q. . . .
So you don't know who put cuffs on Ms. Basco? A. No, sir. Smith Dep. 76:21-77:1; 78:4-13.

*City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993). Having considered the evidence, and viewing all facts and reasonable inferences drawn therefrom in the light most favorable to Plaintiffs, the Court concludes that the summary judgment record raises triable issues of fact for a jury. Because the evidence shows Rodriguez, Smith, and Hancock's personal involvement in each of the alleged Fourth Amendment violations, Plaintiffs claims will proceed against these Defendants.

## V. CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** Bexar County Sheriff's Office Deputies' motion for summary judgment (ECF No. 129).

Plaintiffs' claims for unlawful entry into and search of their home, seizure of property, and excessive force in violation of the Fourth Amendment against Defendants James Hancock, Jacob Rodriguez, and Bryan Smith shall proceed.

The claims against Brian Wolfe, Alexander Uriegas, Eric Richards, Gus Trevino, and Carl Davis are dismissed with prejudice. The Clerk of Court is **DIRECTED** to terminate Defendants Wolfe, Uriegas, Richards, Trevino, and Davis.

The parties must file any sealed proposed redactions to this Memorandum Opinion and Order by **June 30, 2021**. **If no proposed redactions are filed by that date, the Court will forthwith unseal this Memorandum Opinion and Order.**

This matter is set for status conference via Zoom on **July 20, 2021 at 1:00 PM**.

**It is so ORDERED this 11th day of June 2021.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**